**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000248
26-APR-2023
07:46 AM
Dkt. 163 SO**

NO. CAAP-22-0000248

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF V CHILDREN

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(CASE NO.  FC-S-18-00135)

SUMMARY DISPOSITION ORDER
(By:  Leonard, Presiding Judge, Nakasone and Chan, JJ.)

Respondent-Appellant Father (**Father**) appeals, and Respondent-Appellant/Cross-Appellant Mother (**Mother**) cross-appeals, from the March 29, 2022 Order Terminating Parental Rights (**TPR Order**) filed by the Family Court of the First Circuit (**Family Court**).[1]  On May 11, 2022, the Family Court entered Findings of Fact and Conclusions of Law for the TPR Order (**FOFs/COLs**).

Mother raises two points of error on appeal, contending that:  (1) the TPR Order and all FOFs and COLs are clearly erroneous, and specifically FOF 55 and COLs 15 and 16 are clearly erroneous because she did not voluntarily stipulate

_____

[1]  The Honorable Jessi L.K. Hall presided.

to Petitioner-Appellee Department of Human Services's (**DHS**) amended second motion to terminate her parental rights (**Amended Second TPR Motion**); and (2) the Family Court violated Father's due process rights by failing to appoint him counsel for a significant portion of the case.

Father argues that the Family Court violated his due process rights by discharging court-appointed counsel and re-appointing him counsel on the eve of the trial to terminate his parental rights (**TPR Trial**). Father identifies the TPR Order and FOFs 7, 11-22, 83, 86, 103, 105, 107, 107a, 108, 108b, 108c, 108e, 109, 111, 112, 118-19, 122, 123-146 and COLs 10-14 as his points of error.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's and Father's points of error as follows, and affirm.

The following pertinent background is as stated in the FOFs/COLs. EV and JV (collectively **Children**) are the subject children of this appeal.[2] On June 5 and 6, 2018, police removed the Children from Mother's custody, and on June 8, 2018, DHS filed a petition for temporary foster custody of the Children due to physical neglect and lack of supervision. EV was three years old and JV was four years old when they entered foster care on August 4 and 5, 2018, respectively.

Mother did not complete her court-ordered services and failed to consistently visit the Children. Mother's visits with the Children were suspended in October 2021 due to harmful psychological effects the visits were having on the Children.

---

[2] This case involved two additional children: AA and DV. AA is the child of Mother and Father. On September 29, 2020, the Family Court terminated Mother's and Father's rights to AA, and AA was subsequently adopted. DV is the child of Mother and ES (**Boyfriend**). DV was returned to Mother and Boyfriend.

Father resided in New Zealand and never traveled to Oʻahu to see the Children during the pendency of this case. Father knew of monthly court hearings, but chose not to participate. In May 2020, Father contacted the Family Court and received court-appointed counsel, Jacob Delaplane (**Delaplane**). Father subsequently failed to appear at several Family Court hearings and as a result, the Family Court entered default against Father and ultimately discharged Delaplane on November 17, 2020.

On November 8, 2021, DHS filed the Amended Second TPR Motion.[3]

On March 1, 2022, Mother stipulated to the Amended Second TPR Motion. Also on March 1, 2022, after a nearly two-year absence, Father re-appeared with Delaplane. The Family Court re-appointed Delaplane and set aside default against Father prospectively. Thereafter, Father, represented by Delaplane, remotely attended Family Court hearings and the TPR Trial.

On March 29, 2022, the Family Court granted DHS's Amended Second TPR Motion and terminated Mother's and Father's parental rights. The FOFs/COLs contain necessary findings under Hawaii Revised Statutes (**HRS**) § 587A-33(a) (2018).

**(1)** Mother's first point of error is a claim that all FOFs and COLs are clearly erroneous, specifically FOF 55 and COLs 15 and 16 are clearly erroneous because she did not voluntarily stipulate to DHS's Amended Second TPR Motion.[4]

---

[3] On August 24, 2020, DHS filed a motion to terminate parental rights as to the Children, which was subsequently withdrawn. On November 5, 2021, DHS filed a second motion to terminate parental rights.

[4] FOF 55 and COLs 15 and 16 provide:

> 55. Present at a pretrial hearing regarding the DHS' [Amended Second TPR Motion] on March 1, 2022, were Mother, [Boyfriend], Father and their court-appointed counsels.

Mother's blanket objection to all FOFs and COLs does not comply with Rules Expediting Child Protective Appeals (**RECPA**) Rule 11(a)(3), thus it is disregarded pursuant to Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4). See RECPA Rule 1.

FOF 55's finding that Mother's stipulation was voluntarily made is a mixed question of fact and law that is not clearly erroneous. See In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (applying clearly erroneous standard of review to mixed questions of fact and law, which are dependent on the facts and circumstances of each individual case). In support of

---

Father's default from September 22, 2020 was set aside prospectively only, and his court-appointed counsel, Jacob Delaplane, was re-appointed. Father requested a trial on the DHS' [Amended Second TPR Motion], which was set for trial on March 23, 2022. Mother knowingly, intelligently, and voluntarily stipulated to the DHS' [Amended Second TPR Motion] as to the Children filed on November 8, 2021, and the court set aside Mother's trial on March 21-24, 2022. Mother, [Boyfriend] and their respective court-appointed counsels were excused from Father's March 23, 2022 trial.

. . . .

15. "Parental custody of minor children is a fundamental right and any waiver thereof must be voluntarily, knowingly, and intelligently given. The Hawaii Supreme Court has said 'to determine whether a waiver was voluntarily and intelligently undertaken, this court will look to the totality of facts and circumstances of each particular case.' The same rule applies in the context of a parent consenting to permanent custody of the parent's child by the DH." In Re Doe Children, 2003 Haw.App Lexis 176, 20 (citing State v. Friedman, 93 Hawaiʻi 63, 996 P.2d 268 (2000)).

16. "Where it appears from the record that a defendant has voluntarily waived a constitutional right to a jury trial, the defendant carries the burden of demonstrating by a preponderance of the evidence that his/her waiver was involuntary." State v. Friedman, 93 Hawaiʻi 63, 996 P.2d 268 (2000) (citing State v. lbuos, 75 Haw. 118, 120, 857 P.2d 576, 577 (1993)). The same burden applies to parents who stipulate to terminate their parental rights.

4

her argument, Mother cites statements made by herself, her counsel, and the following August 13, 2019 statement by DHS as evidence of pressure to stipulate to the Amended Second TPR Motion:

> But [DHS] does plan on still filing for the legal guardianship for [AA]. And we're hoping the action move [sic] forward as we believe that would be in his best interest for his current resource caregivers to become his legal guardian as [Mother] does have a lot on her plate right now, especially if she wants to bring [the Children] back to the home.

The record, however, reflects that the Family Court conducted a colloquy with Mother prior to accepting her stipulation, to ensure that Mother's mind was clear, she understood what she was agreeing to, that no one was forcing her to agree to terminating her parental rights, that no one promised Mother anything in exchange for her agreement, and that Mother was agreeing of her own free will.[5]

---

[5] The transcript of the March 1, 2022 hearing on Mother's stipulation to the Amended Second TPR Motion contains the following exchange:

> THE COURT [to MOTHER]: . . . So [counsel for Mother] has stated that you are in agreement to the State's motion to terminate your parental rights with regards to [JV] and [EV]. Is that correct?
>
> [MOTHER]: Yes, that's correct.
>
> THE COURT: And do you have any questions with regards to what that means?
>
> [MOTHER]: No.
>
> THE COURT: Okay. And I apologize for asking you this, but are you currently under the influence of any drugs, medication, or alcohol?
>
> (A pause.)
>
> THE COURT: Oh, sorry. You're on mute.
>
> [MOTHER]: No.
>
> THE COURT: Is your mind clear?
>
> [MOTHER]: Yes.

On this record, substantial evidence supports FOF 55's finding that Mother knowingly, intelligently, and voluntarily stipulated to DHS's Amended Second TPR Motion, and Mother's contention is without merit.  See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

COLs 15 and 16 are reviewed de novo for clear error.  See In re JM, 150 Hawaiʻi 125, 137, 497 P.3d 140, 152 (App. 2021) (reviewing family court COLs de novo under the right/wrong standard).  The law summarized in COLs 15 and 16 is accurate, thus COLs 15 and 16 are upheld on appeal.

**(2)** Mother's second point of error, and Father's primary argument, is a claim that the Family Court violated Father's due process rights by discharging Father's counsel for a portion of the case.  Mother lacks standing to raise issues on behalf of Father.  See In re F. Children, Nos. 28882, 28883, 28884, 2009 WL 1300933, at *8 (App. May 8, 2009) (mem.)

---

> THE COURT: Is anyone forcing you to agree to terminate your parental rights?
>
> [MOTHER]: No.
>
> THE COURT: Has anyone promised you anything in exchange for doing so?
>
> [MOTHER]: No.
>
> THE COURT: Are you doing so of your own free will?
>
> [MOTHER]: Yes.
>
> THE COURT: Thank you, [Mother]. And I just want to say I know it's not an easy decision. It was actually a very heartbreaking decision for you to make. We've been with you for quite a long time through this process, but I appreciate you looking at what's best for [JV] and [EV] and for your other children. And I do wish you and [Boyfriend] the best of luck in the mainland.
>
> [MOTHER]: Thank you so much.
>
> THE COURT: So the court is going to find that [Mother] has knowingly, voluntarily and intelligently stipulated to terminate her parental rights in this matter.

6

(citation omitted). Nonetheless, we address the issue because Father raises it.

On March 15, 2023, the Hawaiʻi Supreme Court issued <u>In re JH</u>, No. SCWC-21-0000316, 2023 WL 2518743 at 1 (Mar. 15, 2023), which holds:

> [I]f the family court appoints counsel at the onset of a parental rights case, and later there's a break in representation due to a parent's voluntary absence, then there is no structural error. As long as a fundamentally fair procedure ensues and due process is satisfied, the family court's decision will stand.

The supreme court explained, among other things, that discharge of counsel is not structural error because a fundamentally fair process may still happen in discharge of appointed counsel cases. <u>Id.</u> at *4. As such, <u>In re JH</u> directs appellate courts to "assess[] the proceedings to see if they were fundamentally fair." <u>Id.</u> at *6.

Here, the proceedings as to Father were fundamentally fair in light of Father's admitted knowledge of the Family Court proceedings and choice not to participate in proceedings, DHS's efforts to locate Father and involve him in proceedings, the Family Court's timely appointment of counsel for Father when Father chose to engage in proceedings, and the Family Court's timely re-appointment of counsel for Father when Father chose to re-engage in proceedings.

The record reflects that Father had a meaningful opportunity to participate in the case with the aid of counsel, and the delay in appointment of counsel for Father and the two-year gap in representation due to Father's failure to appear did not render the proceedings fundamentally unfair. As such, Father's argument lacks merit.

**(3)** Father's points of error consist of an objection to the TPR Order and objections to FOFs 7, 11-22, 83, 86, 103,

105, 107, 107a, 108, 108b, 108c, 108e, 109, 111, 112, 118-19, 122, 123-146 (**Contested FOFs**) and COLs 10-14 (**Contested COLs**).[6]

---

6    The Contested FOFs provide:

7.    Father received court-appointed legal representation, despite there not being a clear indication of his income. Jacob Delaplane, Esq. was Father's court-appointed counsel. Mr. Delaplane competently and zealously represented Father during these proceedings.

. . . .

11. On June 13, 2018, at the initial court hearing for the Petition, Mother was served with the summons and the Petition. Mother was provided court-appointed legal representation by Tae Chin Kim, Esq. [Boyfriend] was provided court-appointed legal representation by Cheryl Yamaki, Esq. The court confirmed temporary foster custody and scheduled a continued return hearing for Mother on July 9, 2018. The court reserved the three calls made for Father, whose whereabouts were unknown at the time, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

12. On July 9, 2018, Mother contested the Petition and the court set a mediation for August 13, 2018, and an all-day trial for September 19, 2018. [Boyfriend] stipulated to the adjudication of the Petition and the court invoked its HRS Chapter 587A subject matter jurisdiction over [Boyfriend] and [DV] and awarded [Boyfriend] family supervision of [DV] once he moved to a different residence. The court reserved the three calls made for Father, whose whereabouts remained unknown, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

13. At the mediation on August 13, 2018, Mother was present with her court-appointed counsel and an agreement was reached. Based on Mother's knowing, intelligent, and voluntary stipulation to adjudication of the Petition, the court adjudicated the Petition, invoked its HRS Chapter 587A subject matter jurisdiction over Mother and the Children, awarded the DHS foster custody of the Children, and ordered the service plan dated June 7, 2018, as modified, which included maintaining contact with the DHS social worker, parenting/outreach services/counseling, psychological evaluation cooperate and work in partnership with the DHS social worker. Mother's trial date of September 19, 2018 was set aside. Also present was [Boyfriend] and his court-appointed counsel. The court ordered family supervision of [DV] to [Boyfriend],

8

effective on August 16, 2018. The court reserved the three calls made for Father, whose whereabouts remained unknown, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

14. On August 21, 2018, Mother and [Boyfriend], along with their respective court-appointed counsels, stipulated and the court admitted the case into the Hawaiʻi Zero-To-Three Specialty Court ("HZTT"). The court reserved the three calls made for Father, whose whereabouts remained unknown, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

15. Monthly HZTT hearings were held on September 18, 2018; October 16, 2018; November 20, 2018; January 15, 2019; March 19, 2019; April 16, 2019; June 18, 2019; and September 17, 2019. Present at these hearings were Mother [Boyfriend], and their respective court-appointed attorneys. At each hearing, the court continued existing orders and reserved the three calls made for Father, whose whereabouts remained unknown, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

16. Present at a HZTT monthly hearing on December 18, 2018, were Mother, [Boyfriend], and their respective court-appointed attorneys. The DHS reported to the court that Mother had provided the DHS with Father's phone number, but Father had not answered nor returned any of the DHS' calls. Mother believed Father was residing in New Zealand and was to provide the DHS with Father's address to attempt service. The court reserved the three calls for Father and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

17. Present at a HZTT hearing on February 19, 2019, were Mother, [Boyfriend], and their respective court-appointed attorneys. The court entered the requisite HRS § 587 A periodic review findings, ordered the service plan dated February 8, 2019, and continued foster custody of the Children and [AA] and family supervision of [DV] with [Boyfriend]. The court reserved the three calls made for Father, whose whereabouts remained unknown, and found that although Father was not served, the DHS had made reasonable efforts to locate him and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

9

18. Present at a HZTT hearing on May 21, 2019 were Mother, [Boyfriend] and their respective court-appointed attorneys. The court found that Mother can provide a safe family home for [DV] with the assistance of a service plan and ordered that family supervision of [DV] was extended to include Mother as well as [Boyfriend]. The court reserved the three calls for Father and found that although Father was not served the DHS made reasonable efforts to locate Father and that it would not be in the best interests of the children to postpone the proceedings until service can be completed.

19. Present at a HZTT hearing on July 16, 2019, were the court-appointed counsels for both Mother and [Boyfriend], but Mother and [Boyfriend] were excused for the hearing due to Mother being in labor. The court continued existing orders, authorized the DHS to serve Father by publication, reserved the three calls for Father, and found that although Father was not served, the DHS had made reasonable efforts to locate Father and that it would not be in the best interests of the Children to postpone the proceedings until service could be completed.

20. Present at a HZTT hearing on August 13, 2019, were Mother, [Boyfriend] and their respective court-appointed attorneys. The court entered the requisite HRS § 587A periodic review and permanency findings, continued foster custody of the Children and [AA], continued family supervision of [DV], and ordered the service plan dated August 6, 2019 as modified. As for Father, the court reserved the three calls made for him and found that although Father was not served, the DHS made reasonable efforts to locate Father and that it would not be in the best interests of the children to postpone the proceedings until service can be completed.

21. Present at a HZTT hearing and a return on a Petition for Legal Guardianship for [AA] in FC-G No. 19-1-6235 on October 15, 2019, were Mother, [Boyfriend] and their respective court-appointed attorneys. Mother contested the legal guardianship petition filed by the DHS, which requested legal guardianship of [AA] be granted to his resource caregivers. The court set a mediation for December 9, 2019, and a legal guardianship trial for February 4, 2020. As for Father, the court reserved the three calls made for him and found that although Father was not served, the DHS made reasonable efforts to locate Father and that it would not be in the best interests of the children to postpone the proceedings until service can be completed.

22. Father was served with the Petition by publication, with a return hearing on November 6, 2019.

. . . .

10

83. Dr. Garcia's professional opinion is that moving the children to New Zealand would be a significant risk factor. Since there is no bond with Father, the transition for the children will be difficult.

. . . .

86. Reunification with either Mother or Father would cause the Children psychological harm and regression as neither parent has the ability to provide the necessary stability and high-level of care.

. . . .

103. At the commencement of this matter the DHS social worker only had a phone number for Father. She attempted to call Father several times, but he did not answer and never returned the call.

. . . .

105. Throughout the pendency of this case, Mother maintained contact with Father and informed him about the status of the Children and the ongoing case and court hearings. Despite this information, Father chose not to participate in the majority of the proceedings.

. . . .

107. Father's purposeful limited court appearances throughout the pendency of this case, specifically four out of nearly 50 hearings, demonstrates his inability to prioritize the needs of the Children over his own.

a. Father's first court appearance in this case on June 16, 2020, was nearly 2 years after the Children were removed from Mother's care, and he missed 25 hearings between June 2018 and June 2020.

. . . .

[108] b. Despite being provided with a list of sites to obtain a free paternity/DNA test, Father failed to complete the court-ordered paternity/DNA testing.

[108] c. Despite Father requesting a home study in New Zealand, the New Zealand Child Welfare was unable to proceed on the home study because Father did not complete the required paternity/DNA testing.

. . . .

[108] e. For approximately one hour of the afternoon portion of the trial on March 23, 2022, Father was driving what looked to be his work truck. Father did not make this trial a priority.

109. Father testified that he had the social workers [sic] contact information throughout the life of the case, but that he did not make any attempts to contact her.

. . . .

111. Father lacks insight into the Children's mental health issues, which poses a high risk of harm to the Children.

112. Father testified that he was not aware of the Children's incidents of self-ham [sic] and mental heal [sic] issues, nor their mental health diagnoses.

. . . .

118. Sending the children to New Zealand at this time would not be in their best interest as they are no longer familiar with Father.

119. Father is unable or unwilling to make the Children a priority in order to reunite with them. The Court finds that even if provided with more time, Father will continue to be unable to provide a safe family home for the Children into the foreseeable future.

. . . .

123. Under the circumstances presented in this case, Mother and Father were given every reasonable opportunity to effectuate positive changes to enable them to provide a safe family home with the assistance of a service plan in order to be reunified with the Children.

124. Mother and Father are not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

125. It is not reasonably foreseeable that Mother and Father will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from the Children's date of entry into foster care.

126. Based on the credible expert testimony presented at trial, it is important for parents involved in child welfare cases to develop insight into their problems and safety issues and the causes of their problems in order to facilitate positive lifestyle changes that would allow them to provide a safe family home for their Children. Lack of insight negatively impacts a parent's ability to resolve the parent's problems.

127. Mother and Father lack the insight necessary to consistently address their own safety issues.

12

128. Despite being given an extended period of time to cooperate with the DHS, Mother and Father failed to complete all of the DHS recommended services and failed to demonstrate their ability to provide a safe family home for the Children with the assistance of a service plan.

. . . .

129. Having made the "parental unfitness" findings of fact, pursuant to HRS § 587A-33 (a)(1) and (2) regarding Mother and Father, the Court makes the following findings of fact regarding the Permanent Plan dated November 2, 2021.

130. The goal of the Permanent Plan is permanent custody with the ultimate goal of adoption by the RCGs. The goal of adoption is in accord with the statutory presumption that the goal of adoption in a proposed permanent plan is in a child's best interests. HRS § 587A-32(a).

131. The Permanent Plan dated November 2, 2021 assists in achieving the ultimate goal of the Permanent Plan, which is adoption by the RCGs which is an appropriate home.

132. The Children's [Guardian ad Litem] recommended that permanent custody be awarded to the DHS and that the Permanent Plan dated November 2, 2021 be ordered.

. . . .

133. The DHS' social work, child protective and child welfare assessments, opinions, and recommendations are based on the joint expertise of the social worker and the social worker supervisor through the social worker's consultation with his/her supervisor and the supervisor's supervision and approval.

134. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to avoid foster placement of the Children.

135. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to reunify the Children with Mother and Father by identifying necessary, appropriate, and reasonable services to address Mother's and Father's identified safety issues, and making appropriate and timely referrals for these services. Under the circumstances presented by the instant case, the DHS gave Mother and Father every reasonable opportunity to succeed in remedying the problems which put the Children at substantial risk of being harmed in the family home and to reunify with the Children. The DHS actively encouraged Mother and Father to participate in necessary and reasonable services to allow them to reunify with the Children.

13

136.  Each of the service plans offered by the DHS and ordered by the Court were fair, appropriate, and comprehensive.

137.  None of the underlying facts and data upon which the DHS based its opinions, assessments, and recommendations were shown to be untrustworthy.  The DHS' continuing assessment in this case was conducted in an appropriate manner.

.  .  .  .

138.  Luana Scanlan-Himalaya is a credible witness.

139.  Dr. Lisa Garcia is a credible witness.

140.  Sara Robinson is a credible witness.

141.  Father's testimony is credible except for his testimony that he is willing and able to provide a safe family home for the Children which is not credible.

142.  Mother's testimony on March 1, 2022 stipulating to the DHS' Amended MTPR filed on November 8, 2021 was credible.

143. It is reasonable for the DHS social worker Luana Scanlan-Himalaya, testifying on behalf of the DHS and as an expert witness in the areas of social work and child protective and welfare services, to rely on facts provided by service providers and the DHS personnel such as the DHS social service assistants to provide the bases for her expert opinions.  The facts she used to form her expert assessments and opinions are of a type reasonably relied upon by experts in her field.  Her testimony reflects the DHS' expert social work and child protective and welfare assessments and opinions in the instant case.

144.  It is reasonable for Dr. Lisa Garcia, testifying as an expert witness in the area of clinical psychology, to rely on facts provided by her clients, the resource caregivers, family members, the DHS and the DHS personnel such as the DHS social service assistants to provide the bases for her expert opinions.  The facts she used to form her expert assessments and opinions are of a type reasonably relied upon by experts in her field.  Her testimony reflects the expert clinical psychological assessments and opinions in the instant case.

145.  These Findings of Fact are based on the Court's evaluation of the credibility of the witnesses and the weight of the evidence, and reflect the testimony found credible by the Court and reasonable inferences therefrom.

14

Father's blanket objection to the TPR Order does not comply with RECPA Rule 11(a)(3), and it is disregarded pursuant to HRAP Rule 28(b)(4).  See RECPA Rule 1.

Father's objections to the Contested FOFs and the Contested COLs are either waived, lack merit, or are harmless.

---

146.  To the extent that some of the Conclusions of Law noted below can be construed to be Findings of Fact, said Conclusions are incorporated herein.

(Footnotes omitted).

The Contested COLs 10-14 provide:

10.  The legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578A, are not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

11.  It is not reasonably foreseeable that the legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578A, will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

12. [sic]  Having made Conclusions of Law pertaining to "parental unfitness" pursuant to HRS § 587A-33 (a)(1) and (2), the Court makes the following Conclusion of Law regarding the proposed Permanent Plan pursuant to HRS § 587A-33(a)(3).

12. The Permanent Plan dated November 2, 2021 is in the best interests of the Children.

13. The court was not required to provide Father with counsel because as noted in *In re T.M.*, 131 Hawaiʻi 419, 436, 319 P.3d 338, 355 (2014), Father was not found by the court to be indigent.

14. As the court was not required to appoint counsel for Father, there was no structural error warranting vacatur of the Order Terminating Parental Rights filed on March 29, 2022.  *In re L.I.*, 149 Hawaiʻi 118, 122, 482 P.3d 1079, 1083 (2021).

The FOFs/COLs are misnumbered and include a second COL 12.  Father contests the second COL 12 ("The Permanent Plan dated November 2, 2021 is in the best interests of the Children.").

As such, the Contested FOFs and Contested COLs are upheld on appeal.[7]

For the foregoing reasons, we affirm the March 29, 2022 Order Terminating Parental Rights, and the May 11, 2022 Findings of Fact and Conclusions of Law, both filed and entered by the Family Court of the First Circuit.

DATED:  Honolulu, Hawaiʻi, April 26, 2023.

On the briefs:

Jacob G. Delaplane,
(Law Office of Jacob G. Delaplane),
for Father-Appellant.

Tae Chin Kim,
for Cross-Appellant Mother.

Kellie M. Kersten,
Julio C. Herrera
Deputy Attorneys General
for Petitioner-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Karen T. Nakasone
Associate Judge

/s/ Derrick H.M. Chan
Associate Judge

---

[7]     Specifically, Father's objections to FOFs 7, 111, and 123-146, and COL 12 are waived for lack of discernable argument.  RECPA Rule 1; HRAP Rule 28(b)(7); Hussey v. Say, 139 Hawaiʻi 181, 191, 384 P.3d 1282, 1292 (2016).  The record contains substantial evidence to support FOFs 11-22, 83, 86, 103, 107, 107a, 108, 112, 118-19, 122; thus they are not clearly erroneous.  Any errors identified in FOFs 105, 108b, 108c, 108e and 109 are harmless because they do not negate the substantial evidence supporting the Family Court's termination of Father's parental rights.  HFCR Rule 61.  In light of the FOFs, COLs 10 and 11, which are mixed questions of fact and law, are not clearly erroneous.  See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.  Any errors in COLs 13 and 14 are harmless in light of the Family Court's provision of fair process.  See discussion supra at Section (2).